# SOFTWARE LICENSE AGREEMENT
## BY
## QUASAR SPENDTHRIFT TRUST

This Software License Agreement (the **"License Agreement"**), is entered into on the last date of execution below (the **"Effective Date"**), by and between **Quasar Spendthrift Trust**, located at 1625 Hinson St, Las Vegas, Nevada 89102 (the **"LICENSOR" or "QUASAR"**) and **Apex Trader Funding Inc**, located at 2028 E. Ben White Blvd. Ste 240-9873. Austin, TX 78741 (the **"LICENSEE" or "APEX")** (which together with Licensor, may be referred to collectively as the **"Parties,"** or individually as a **"Party"**).

WHEREAS, LICENSOR is the assigned owner of the proprietary, copyright registered technology and code herein referred to as the Licensed Software, as defined in Section 1.7, "Licensed Software" below;

WHEREAS, LICENSEE is a Texas For-Profit Corporation that is the sole and complete owner of the business that includes, ApexTraderFunding.com, the APEX Platform, content, software, and any and all materials related to APEX's business operations (the "APEX Business") except for the Licensed Software;

WHEREAS LICENSEE desires to obtain a license to use the Licensed Software subject to the terms and conditions of this License Agreement;

WHEREAS LICENSOR desires to license the Licensed Software to LICENSEE; and

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **DEFINITIONS.** For purposes of this License Agreement,
    1. **"License Agreement"** means this Software License Agreement as set forth in the preamble.
    2. **"Confidential Information"** means any non-public information in any form and however transmitted, whether orally, visually, in writing, or by electronic communication, that both Parties reasonably and in good faith deem to be confidential or proprietary. Confidential Information includes, but is not limited to, technological disclosures, trade secrets, ideas, concepts, know-how, business operations, plans, strategies, customer information, pricing information, and any other information that the disclosing Party is contractually or otherwise bound to keep confidential. Confidential Information may, but is not obligated to be designated, marked, or otherwise identified as "confidential." See exclusions in Section 10, "Confidentiality" below.

EXHIBIT A

3. **"Documentation"** means any and all manuals, instructions, and other end user materials that LICENSOR provides to LICENSEE describing the Licensed Software's functionality, components, technical specifications, capabilities, requirements, or limitations. Documentation may include, but is not limited to, aspects of the software that are of practical importance to LICENSEE, such as instructions on installation, configuration, integration, operation, use, support, or maintenance.
4. **"Effective Date"** has the meaning set forth in the preamble. It is the start date for this Agreement where all rights and obligations herein become operational and enforceable.
5. **"Intellectual Property Rights"** means any and all registered and unregistered rights to plans, ideas, designs, or other intangible assets. Such rights are granted, applied for, or otherwise now or hereafter in existence under or related to any patent, copyright, trademark, trade secret, database protection, right of publicity, other intellectual property rights laws, and all similar or equivalent rights or forms of protection, in any part of the world.
6. **"Law"** means any statute, code, ordinance, rule, regulation, constitution, order, treaty, precedent, judgment, or other legal requirements of any authority of competent jurisdiction, including, but not limited to, federal, state, local, or foreign governments, political agencies or subdivisions thereof, or any appropriate courts or tribunals.
7. **"Licensed Software"** means the "Funding Program Automation Engine" which is copyright registered technology that handles and directs API calls and routes communication between servers and systems.
8. **"LICENSEE"** has the meaning set forth in the preamble.
9. **"LICENSOR"** has the meaning set forth in the preamble.
10. **"Maintenance Release"** means any update, upgrade, release, or other adaptation or modification of the Licensed Software or Documentation that LICENSOR may optionally and periodically provide to LICENSEE during the Term (as defined below). Such Maintenance Release may include, but is not limited to, error corrections, enhancements, improvements, or other changes to the Licensed Software's functionality, compatibility, capabilities, performance, efficiency, user interface, or quality. LICENSEE shall not be liable for downtime of the Licensed Software.
11. **"Parties"** mean the LICENSOR and LICENSEE collectively as set forth in the preamble.
12. **"Party"** means the LICENSOR or LICENSEE individually as set forth in the preamble.
13. **"APEX Platform"** means an internet-based platform that APEX utilizes to provide, among other things, financial education, evaluation, plug-in's, and tools that consumers may utilize with regard to trading a variety of financial instruments. APEX Platform encompasses code, email, software, hardware, servers, websites, domains, databases, links to third-party partners, and the like on which the APEX Business is operated, maintained, accessed by customers

and prospective customers for the operation of the APEX Business, except that the Licensed Software is separate from the APEX Platform even though the APEX Platform utilizes the Licensed Software;

14. **"Permitted Use"** means use of the Licensed Software by an authorized user for the benefit of Licensee on the APEX Platform in its ordinary course of internal business operations.
15. **"Open-Source Components"** means any software component that is subject to an open-source copyright license agreement. Qualifying open-source copyright license agreements include, but are not limited to, Apache License 2.0, BSD 3-Clause "New" or "Revised" license, BSD 20-Clause "Simplified" or "FreeBSD" license, GNU General Public License, GNU Library or "Lesser" General Public License, MIT License, Mozilla Public License 2.0, Common Development and Distribution License, Eclipse Public License, and any other obligations, restrictions, or license agreements that substantially conform to the "Open Source Definition" as prescribed by the Open Source Initiative or otherwise may require third-party disclosure or licensing if any source code of such software components is used or compiled.
16. **"Term"** has the meaning set forth below in Section 3, "Term."

2. **LICENSE GRANT.** Subject to and conditioned on Licensee's payment of the License Fees and compliance with the terms and conditions of this Agreement, LICENSOR hereby grants to LICENSEE, solely for defined Permitted Use, a non-exclusive, non-sublicensable, and non-transferable license (except in the case of a sale of APEX that includes the Licensed Software and is authorized by LICENSOR) to use the Licensed Software and Documentation during the Agreement Term.

    1. **Scope of the License Grant and Use of the Licensed Software.** The Licensed Software shall be hosted on its own server which is owned and maintained by LICENSOR.
    2. LICENSEE shall be given access to that server only with the limited capability to restart the server, if needed.
    3. LICENSEE is granted the right to connect to the Licensed Software running on that server solely for the purpose of routing API calls related to the operation of the APEX Platform.
    4. LICENSEE can use the Licensed Software only on a single (1) website (e.g., apextraderfunding.com).
    5. **Open-Source Licenses.** Should the Licensed Software include any Open-Source Components, LICENSEE's use of the Open-Source Components will be governed by, and subject to, the terms and conditions of the related open-source and public licenses. LICENSOR shall provide LICENSEE with the license name, author information, license source, access information, and other relevant information for such Open-Source Components.
    6. **Use Restrictions.** LICENSEE shall not use the Licensed Software for any purposes beyond the scope of the license granted in this Agreement. Without limiting the foregoing and except as otherwise expressly set forth in this License Agreement, LICENSEE shall not at any time, directly or indirectly: (i) copy,

    modify, or create derivative works of the Software, in whole or in part; (ii) rent, lease, sell, sublicense, assign, distribute, transfer, or otherwise make available the Software; (iii) reverse engineer, disassemble, decompile, decode, adapt, or otherwise attempt to derive or gain access to the source code of the Software, in whole or in part; or (iv) use the Software in any manner or for any purpose that infringes, misappropriates, or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law.

    7. **Reservation of Rights.** LICENSOR reserves all rights not expressly granted to LICENSEE in this License Agreement. Except for the limited rights and licenses expressly granted under this License Agreement, nothing in this License Agreement grants, by implication, waiver, estoppel, or otherwise, to Licensee or any third party any intellectual property rights or other right, title, or interest in or to the Software.

3. **TERM.** The term of this Agreement commences as of the Effective Date and shall continue in effect indefinitely until termination, pursuant to the terms of Sections 11 "Termination" and 12, "Termination or Expiration Effects" below.
4. **ACCESS.** LICENSOR shall make available the Licensed Software to LICENSEE on or before ten (10) business days after the Effective Date. LICENSOR shall collaborate with LICENSEE in assuring proper connection, stability and usability to work with the LICENSEE's server, the APEX Platform and content.
5. **FEES AND TAXES.** In consideration of the rights and services granted to LICENSEE under this Agreement, LICENSEE agrees to pay to LICENSOR the following fees in accordance to the payment terms set forth in this Agreement:
    1. **License Fee.** The License Fee shall be thirty-three percent (33%) of APEX's net profits, if any, as determined by APEX, which shall be determined and paid out on a monthly basis subject to certain holdbacks that relate to the normal operation of the APEX business including, without limitation, any potential holdbacks and reserves related to client payoffs, business needs, present or future, regulation and merchant reserve requirements, funding of risk capital and margin for live prop fund accounts.
    2. **Audit Rights and Required Records.** LICENSEE agrees to maintain complete and accurate records in accordance with generally accepted accounting principles during the Term and for a period of two (2) years after the termination or expiration of this Agreement with respect to matters necessary for accurately determining amounts specifically due hereunder. In the case of a three (3) month period of unusual, irregular, and/or questionably low License Fees, Licensor may, at its own expense, on reasonable prior notice, engage an independent third-party to inspect and audit LICENSEE's records with respect only to matters covered by this License Agreement provided that such auditor shall only disclose to LICENSOR the amount of underpayment, if any, resulting from the audit and inspection and that LICENSOR shall not have access to the details of LICENSEE's financials obtained by the auditor. If such inspection and audit reveal that LICENSEE has underpaid LICENSOR with respect to any amounts

   due and payable during the Term, LICENSEE shall promptly pay the amounts necessary to rectify such underpayment, together with interest in accordance with this Section 5, "Fees and Taxes." LICENSEE shall pay for the costs of the audit if the audit determines that LICENSEE's underpayment equals or exceeds five percent (5%) for any month. Such inspection and auditing rights will extend throughout the Term of this License Agreement and continue for a period of two (2) years after the termination or expiration of this License Agreement.
   3. **Taxes.** All fees are exclusive of taxes, duties, and other similar assessments. LICENSEE is responsible for all sales, service, use, exercise, and all other similar taxes, duties, and charges of any kind imposed by any governmental, federal, state, local, or regulatory authority on any amounts payable by LICENSEE hereunder. Notwithstanding the forgoing, LICENSOR is solely responsible for its own income tax.

6. **PAYMENT.**
   1. **Payment Terms.** Payment shall be due under this License Agreement on or before the fifth (5th) day of each month, for the previous month's net profit amount. APEX shall send a net profit report summary each month along with payout and will alert LICENSOR ahead of time, in good faith, if expected / unexpected events have arisen that will have effect on the current month net profit.
   During the Term of this License Agreement, in the case of a potential sale of APEX or a substantial portion of APEX assets, LICENSOR will have the option to choose to continue an ongoing monthly License Fee Agreement of 33% of net profits, with the new owners, or can choose to receive 33% of the Sales Price of APEX from the sale transaction. All fees related to any sale of APEX shall be paid within thirty (30) days of closing to LICENSOR.

   **Late Payment.** If any payment to LICENSOR is delinquent, then in addition to all other remedies available to LICENSOR,
      1. LICENSOR may charge reasonable interest on the past due amount at a rate no higher than the highest rate permitted under applicable Law;
      2. LICENSOR shall notify LICENSEE of the delinquent payment and LICENSEE shall have fifteen (15) days to resolve the delinquency prior to LICENSOR taking any further steps or action to collect on the delinquent payment;
      3. LICENSEE must reimburse LICENSOR for all reasonable costs incurred to collect any and all late payment and associated interest amounts, including, but not limited to, any attorneys' fee, court costs, and collection agency fees; and
      4. If the payment delinquency continues beyond thirty (30) days following written notice or demand for payment, LICENSOR may exercise any or all of the following remedies: (1) technologically disable LICENSEE's use of the Licensed Software; (2) withhold, suspend, or revoke this License

      Grant; and/or (3) terminate this License Agreement pursuant to the Termination provisions in Section 11, "Termination."

7. **MAINTENANCE RELEASE.** During the Term, LICENSOR may, at LICENSOR's sole option and discretion, provide LICENSEE with Maintenance Releases and updated Documentation. All Maintenance Releases are considered part of the Licensed Software and are subject to all applicable terms and conditions in this License Agreement. LICENSOR agrees to provide any Maintenance Releases free of charge.

8. **TITLE, INTELLECTUAL PROPERTY RIGHTS, AND INFRINGEMENT**
    1. **Ownership.** LICENSEE acknowledges and agrees that
        1. LICENSOR is and will remain the sole and exclusive owner of all rights, title, and interest in and to the Licensed Software, Documentation, Maintenance Release, and all Intellectual Property Rights associated herein, subject only to the rights of any disclosed third parties, within any Open-Source Components, and the limited license granted to LICENSEE under this License Agreement;
        2. The Licensed Software, Documentation, and Intellectual Property Rights are licensed, not sold, to LICENSEE. LICENSEE does not, has not, and will not acquire any ownership interest in the Licensed Software, Documentation, or any related Intellectual Property Rights through this License Agreement;
        3. Nothing in this License Agreement grants any implied rights to LICENSEE, including by implication, waiver, or estoppel, in any Intellectual Property Rights or other rights, title, or interest in any portion of the Licensed Software and Documentation; and
        4. LICENSOR agrees that LICENSEE is and will remain the sole and exclusive owner of all rights, title, control and interest in and to the business located at ApexTraderFunding.com, the APEX Platform, Content, materials, any and all other items, systems, software, plug in, IP, tech, or licenses past, present or future pertaining to the use, creation of or for any operation in connection to the Apex Platform and/or the APEX Business.
    2. **LICENSEE Cooperation and Notice of Infringement.** LICENSEE will, during the Term,
        1. secure and protect the Licensed Software and Documentation from infringement, misappropriation, misuse, theft, or other unauthorized access through all commercially reasonable measures and precautions similar to those LICENSEE would employ to secure and protect its own intellectual property;
        2. take all reasonable steps as LICENSOR may require and request to maintain the validity, enforceability, and ownership of all LICENSOR's Intellectual Property Rights herein;
        3. promptly notify LICENSOR in writing if LICENSEE becomes aware of any actual or suspected infringement, misappropriation, misuse, theft,

    unauthorized access, or other violations of LICENSOR's Intellectual Property Rights in or relating to the Licensed Software or Documentation;

4. promptly notify LICENSOR in writing of any claim that the Licensed Software or Documentation, in whole or in part, infringes, misappropriates, or otherwise violates any rights, including Intellectual Property Rights, of other persons or entities; and
5. fully cooperate with and assist LICENSOR in all commercially reasonable ways, including but not limited to providing records, information, depositions, and testimonies, and at LICENSOR's sole expense, in any claim, suit, action, or proceeding to prosecute or defend LICENSOR's rights in the Licensed Software, Documentation, and any Intellectual Property Rights herein.

9. **SECURITY MEASURE DISCLOSURE.**
   1. The Licensed Software may contain security features that prevent unauthorized or illegal use of the Licensed Software. LICENSEE acknowledges and agrees that LICENSOR may use these features and other lawful measures to verify LICENSEE's compliance with the terms of, and to enforce LICENSOR's rights under, this License Agreement. LICENSEE further acknowledges and agrees that LICENSOR may, from time to time at LICENSOR's sole discretion, gather LICENSEE's technical, usage, and other related information without disruption to LICENSEE's use and for the sole purpose of improving the Licensed Software's performance, developing Maintenance Releases, and developing new versions of the Licensed Software.
   2. From time to time access to the APEX Platform and Content may be needed for service, reconnections, adjustments, upgrades, maintenance or for any other reasons. It is agreed that during these times of access, as granted by APEX, all access and exposure to APEX Content and APEX Platforms will be held confidential and LICENSOR agrees to secure and protect all APEX Platforms from breach, exposure, malicious codes, bugs, encryption, access or any other items that would cause harm, disrupt, cause failure, lack of access, exclusive control, rights, ownership, oversight and management by APEX. LICENSOR acknowledges and agrees that it shall not, without express written permission from LICENSEE, change, alter, amend, or cause any harm to the APEX Platform.

10. **CONFIDENTIALITY.**
    1. **Confidential Information.** In connection with this License Agreement, each Party may disclose or make available to the other Party Confidential Information which includes, but is not limited to, the Licensed Software, Documentation, and any terms of this License Agreement.
    2. **Exclusions and Exceptions.** Confidential Information excludes information that
       1. was rightfully and lawfully known to the recipient without any restrictions on use or disclosure prior to disclosure by disclosing Party in connection with this License Agreement;

   2. was or becomes part of the public domain by means other than by the recipient or any of the recipient's representatives' violations of this License Agreement;
   3. was or is received by the recipient on a non-confidential basis from a third party that was not, or is not, at the time of such receipt, under any obligation to maintain its confidentiality; or
   4. was or is independently developed by the recipient without reference to or use of any Confidential Information.
3. **Protection of Confidential Information.** As a condition of receiving any Confidential Information, the recipient will, for three years,
   1. only access or use Confidential Information if absolutely necessary to exercise the recipient's rights or perform the recipient's obligations under this License Agreement;
   2. except when compelled by Law, not disclose or permit access to Confidential Information other than to the recipient's representatives on a need-to-know basis for the recipient to exercise its rights or perform its obligations under this License Agreement, under strict information and understanding of the confidential nature of Confidential Information and the recipient's obligations to protect Confidential Information, and with acknowledgment from such representatives that they too are bound by the confidentiality and restricted use obligations set forth herein;
   3. use, at minimum, the same degree of care that recipient uses to protect its own similarly sensitive information, and no less than a generally commercially reasonable degree of care, to secure and protect Confidential Information from unauthorized use, access, or disclosure;
   4. promptly notify the disclosing Party in writing of any actual or suspected unauthorized use or disclosure of Confidential Information and cooperate with disclosing Party by taking all reasonable steps to prevent further unauthorized use or disclosure; and
   5. ensure recipient's representatives comply with the terms of this section and are responsible and liable for their noncompliance, if any.
4. **Trade Secrets Confidentiality Duration.** Notwithstanding any other provisions in this License Agreement, the recipient is obligated to protect any Confidential Information that constitutes as trade secrets under any applicable Law until such Confidential Information ceases to qualify for trade secret protection by operation of Law.
5. **Compelled Disclosure.** To the extent permitted by Law, if the recipient or its representatives are compelled by Law to disclose any Confidential Information, the recipient must promptly, and prior to such disclosure, notify the disclosing Party in writing of such requirement to allow the disclosing Party the opportunity to seek a protective order or other legal remedy. The recipient must also provide reasonable assistance to the disclosing Party to oppose such disclosure, to seek a protective order, or to seek other disclosure limitations or remedies. If disclosure is unavoidable, the recipient may disclose only such Confidential

Information that the recipient is legally required to disclose. Upon disclosing the Party's request, the recipient must use commercially reasonable efforts to obtain assurances of confidential treatment of all compelled Confidential Information from the applicable court or legal authority.

11. **TERMINATION.** This Agreement may be terminated only in accordance with the following conditions:
    1. by LICENSOR only in the event that LICENSEE fails to make payment in accordance with all agreements outlined in Section 6, "Payment" above. Upon discovery of any default or breach of Section 6, LICENSOR shall promptly provide written notice thereof to LICENSEE, specifying the nature of the default or breach. LICENSEE shall have a period of 30 days from receipt of such notice to cure the default or breach to the reasonable satisfaction of Section 6 of this License Agreement. If LICENSEE fails to cure such default or breach within said 30-day period, LICENSOR may, at its sole discretion, terminate this License Agreement immediately thereafter.
    2. by LICENSEE at any time with thirty (30) day written notice.
    3. by both Parties upon mutual written agreement.
12. **TERMINATION OR EXPIRATION EFFECTS.** Upon termination or the natural expiration of this License Agreement,
    1. all License Grants, rights, and authorizations granted to LICENSEE herein will immediately terminate.
    2. all amounts payable of any kind under this License Agreement are immediately due and payable effective on the expiration date or early termination date.
13. **MUTUAL REPRESENTATIONS AND WARRANTIES.** Each Party represents, warrants, and covenants to the other Party that
    1. it is duly established, validly existing, and in good standing to conduct business as a sole proprietorship, partnership, company, corporation, trust, organization, or any other valid entity under the Laws of its jurisdiction;
    2. it has the full right, power, and authority to enter into this License Agreement;
    3. it is capable of performing its obligations and granting any licenses, rights, and authorizations specified under this License Agreement;
    4. the executing representative for each Party is duly authorized to represent each Party in this License Agreement by all necessary business formalities and organizational actions; and
    5. This License Agreement is legal, valid, binding on, and enforceable against each Party when fully and mutually executed and delivered.
14. **INDEMNIFICATION**
    1. **LICENSOR Indemnification.** LICENSOR shall indemnify, defend, and hold harmless LICENSEE, its officers, directors, members, employees, agents, trustees, affiliates, and other representatives from and against any and all losses incurred by LICENSEE arising from any third-party action, suit, or claim that alleges the Licensed Software, or any use of the Licensed Software in accordance with this License Agreement, infringes any Intellectual Property Rights.

2. **LICENSOR Indemnification Exceptions.** The foregoing LICENSOR indemnification does not apply to the extent that such actions or losses arise from any allegation of or relating to any
    1. patent, copyright, or trademarks issued on a patent, copyright, or trademark application published or granted after the Effective Date;
    2. unauthorized, unlicensed, and unpermitted modification of the Licensed Software without LICENSOR's express knowledge, written consent, and in direct contradiction to LICENSOR's Documentation specifications;
    3. unauthorized, unlicensed, and unpermitted use of the Licensed Software outside the purpose, scope, or manner authorized by this License Agreement or in any manner contrary to LICENSOR's instructions;
    4. Open-Source Components, other third-party materials, or any material outside of LICENSOR's exclusive control;
    5. failure to promptly install and implement any Maintenance Release or Licensed Software replacement in order received and made available to Licensee by LICENSOR;
    6. Licensed Software use after LICENSEE's receipt of LICENSOR's written notice that such continued use may be alleged to or actually infringe upon, misappropriate, or otherwise violate a third party's rights;
    7. Open-Source Components or other third-party materials;
    8. negligence, abuse, misapplication, or misuse of the Licensed Software by or on behalf of LICENSEE, its representatives, or a third party;
    9. causes or conditions outside LICENSOR's commercially reasonable control, including, but not limited to, any third-party equipment error or LICENSEE's own system bugs, defects, or malfunctions; or
    10. actions or losses for which LICENSEE is obligated to indemnify LICENSOR pursuant to this Agreement.
3. **Licensee Indemnification.** LICENSEE will indemnify, defend, and hold harmless LICENSOR and its officers, directors, members, employees, agents, trustees, affiliates, and other representatives from and against any and all losses incurred by LICENSOR due to any third-party actions, claims, or suits should such losses relate to any allegation
    1. that any rights, including Intellectual Property Rights, is or will be infringed, misappropriated, or otherwise violated by LICENSEE's unauthorized use of the Licensed Software in a manner inconsistent with the License Grant in this License Agreement and Documentation;
    2. of or relating to matters that would be deemed a LICENSEE breach of representation, obligation, covenant, or warranty under this License Agreement if proven true;
    3. of or relating to negligence, abuse, misapplication, misuse, or other culpable acts or omissions by or on behalf of LICENSEE or its representatives with respect to the Licensed Software or otherwise in connection with this License Agreement; or

- - 4. of or relating to the unauthorized, unlicensed, and unpermitted use of the Licensed Software or Documentation outside the purpose, scope, or manner authorized by this License Agreement or in any manner contrary to LICENSOR's instructions.
  - 4. **Sole Remedy.** THIS SECTION CONSTITUTES LICENSEE'S SOLE REMEDIES AND LICENSOR'S SOLE OBLIGATIONS AND LIABILITIES FOR ANY CLAIMS OR ALLEGATIONS, WHETHER ACTUAL OR THREATENED, THAT THIS AGREEMENT, SOFTWARE, DOCUMENTATION, OR ANY SUBJECT MATTER HEREOF, INFRINGES, MISAPPROPRIATES, OR OTHERWISE VIOLATES ANY INTELLECTUAL PROPERTY RIGHTS OF ANY THIRD PARTY.
15. **LIMITATION OF LIABILITY.**
    1. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, UNDER NO CIRCUMSTANCE, INCLUDING WHERE PARTIES WERE ADVISED THAT LOSSES OR DAMAGES WERE POSSIBLE OR FORESEEABLE, WILL EITHER PARTY BE LIABLE UNDER OR IN CONNECTION WITH THIS AGREEMENT FOR ANY: COST INCREASE; BUSINESS, PRODUCTION, REVENUES, OR PROFITS LOST; VALUE DIMINUTION; REPUTATIONAL LOSS; DAMAGED GOOD WILL; USE, INABILITY TO USE, DELAY, INTERRUPTION, LOSS, OR RECOVERY OF ANY LICENSED SOFTWARE, OPEN-SOURCE COMPONENTS, OR ANY THIRD-PARTY MATERIALS; DATA OR SYSTEM SECURITY BREACH, CORRUPTION, DAMAGE OR RECOVERY; REPLACEMENT COST OF GOODS, SOFTWARE, OR SERVICES; OR SPECIAL, INDIRECT, CONSEQUENTIAL, EXEMPLARY, ENHANCED, OR PUNITIVE DAMAGES UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING, BUT NOT LIMITED TO, BREACH OF CONTRACT, TORT, NEGLIGENCE, AND STRICT LIABILITY.
    2. <u>Waiver Clause for Liability for Illegal Use of License</u>: The undersigned party acknowledges and agrees that the License Grant herein is solely for lawful and authorized use. LICENSOR shall not be liable for any illegal or unauthorized use of the License by LICENSEE or any third party, whether intentional or unintentional. LICENSEE assumes full responsibility for ensuring that the License is used in accordance with all applicable laws, regulations, and contractual obligations. In consideration of the License Granted, LICENSEE hereby waives and releases LICENSOR from any and all claims, demands, liabilities, losses, damages, costs, and expenses (including reasonable attorneys' fees) arising out of or related to any illegal or unauthorized use of the License. This waiver and release shall survive the termination or expiration of this License Agreement.
16. **SUPERSEDES PREVIOUS AGREEMENTS.** This Agreement supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof. All such prior agreements and understandings are hereby terminated and deemed of no further force or effect.

17. **FORCE MAJEURE.** Neither Party will be liable to the other by reason of failure or delay in the performance of this License Agreement if the failure arises out of any circumstance beyond such Party's reasonable control, including acts of God, flood, fire, natural disaster, war, terrorism, invasion, riot, civil unrest, embargos, national or regional emergency, strikes, labor disruptions, Law changes, or power or telecommunication interruptions or shortages. The Party failing or delaying in performance of this License Agreement due to circumstances beyond their control must give prompt written notice to the other Party stating the estimated length of time the occurrence is expected to continue. Either Party may terminate this License Agreement if such uncontrollable circumstance continues for longer than thirty (30) days.
18. **GENERAL PROVISIONS.**
    1. **Relationship of the Parties.** Nothing contained in this License Agreement shall be construed as creating any agency, partnership, or any other form of joint enterprise, employment, or fiduciary relationship between the Parties. Neither Party shall have the authority to bind the other in any manner.
    2. **Notices.** Notices will be deemed effectively given when received if delivered by hand; when received if sent by a nationally recognized courier with required signature upon receipt; when sent if delivered by email with transmission confirmation and sent during receiving party's normal business hours; and on the next business day if delivered by email with transmission confirmation and sent after normal business hours.

       Any notice, request, consent, claim demand, waiver, or other communication under this Agreement must be in writing and addressed to Parties as follows:
       1. **LICENSOR**
          Address: 1625 Hinson St. Las Vegas, NV 89102.
          Email: kralord@gmail.com with copy to notices@lloydmousilli.com
       2. **LICENSEE**
          Address: 2028 E. Ben White Blvd. Ste 240-9873. Austin, TX 78741.
          Email: darrell@apextraderfunding.com

    3. **Publicity.** Each Party agrees to seek express permission and written consent before using the other Party's trademarks, service marks, trade names, logo, domain names, or other indicia of source, association, or sponsorship for any purpose but specifically relating to publicity, marketing, or commercial materials.
    4. **Governing Law.** This License Agreement is governed by and construed in accordance with the Laws of the State of Texas without giving effect to any choice or conflict of law provisions or rules that would permit the application of the laws of any other jurisdiction.
    5. **Arbitration.** Unless all Parties agree otherwise, LICENSOR and LICENSEE agree that any dispute, claim, or controversy arising out of or relating to this License Agreement will be resolved through mandatory binding arbitration administered by the American Arbitration Association (AAA) in accordance with its Commercial Arbitration Rules, and the judgment of its arbitrator(s) may be

entered by any court of competent jurisdiction. LICENSOR and LICENSEE further agree that the U.S. Federal Arbitration Act governs the interpretation and enforcement of this provision. EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY AND ALL RIGHTS TO BRING OR PARTICIPATE IN A CLASS ACTION OR MULTI-PARTY ACTION IN ANY ACTION, PROCEEDING, OR COUNTER-CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT. ALL CLAIMS AND DISPUTES ARISING OUT OF THIS AGREEMENT MUST BE ARBITRATED OR LITIGATED ON AN INDIVIDUAL BASIS AND NOT ON A CLASS BASIS. ANY DISPUTE, CLAIM, OR CAUSE OF ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT MUST BE COMMENCED WITHIN ONE YEAR AFTER THE CAUSE ACCRUES; OTHERWISE, SUCH CAUSE OF ACTION WILL BE PERMANENTLY BARRED. This provision will survive the termination of this License Agreement.

6. **Headings.** The section and subsection headings or captions in this License Agreement are for reference only and do not affect the meaning or interpretation of this License Agreement.

7. **Further Assurances.** The Parties will cooperate with each other, execute and deliver such documents or instruments, and take all further actions as may be reasonably requested by the Parties from time to time in order to carry out, evidence, or confirm their rights or obligations or as may be reasonably necessary or helpful to give full effect to this License Agreement.

8. **Amendment and Modifications.** This License Agreement may be supplemented, amended, or modified only by mutual and written agreement of all Parties. No amendment, modification, rescission, or termination is effective unless it is in writing and executed by all Parties or their authorized representatives.

9. **Waiver.** No Party to this License Agreement is deemed to have waived any of their rights, powers, remedies, or privileges under this License Agreement unless such waiver is expressly set forth in writing and signed by the waiving Party. Except as otherwise set forth in this License Agreement, the failure to exercise or enforce any rights, powers, remedies, or privileges under this License Agreement will in no way be construed as a present or future waiver of such rights, powers, remedies, or privileges.

10. **Assignment.** Except as otherwise expressly permitted in this License Agreement, LICENSEE may not, directly or indirectly, sell, assign, sublicense, lease, rent, distribute, or otherwise transfer the Licensed Software or any license rights and obligations under this License Agreement, to any other person or entity without express written consent by LICENSOR.

11. **No Third-Party Beneficiaries.** This License Agreement is made and entered into for the sole benefit of the Parties. Nothing in this License Agreement, express or implied, is intended to or shall confer on or create to any other person or entity any legal or equitable right, benefit, or remedy of any kind whatsoever.

12. **Counterparts.** This License Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement. A signed copy of this License Agreement delivered by electronic transmission, including email or facsimile, is deemed to have the same legal effect as delivery of an original signed copy of this License Agreement.
13. **Severability.** If any provision of this License Agreement or the application thereof is held to be illegal or invalid or unenforceable for any reason and to any extent, then that provision will be considered removed from this License Agreement. However, the remaining provisions will continue to be valid and enforceable according to the intentions of all Parties and to the maximum extent permitted by Law. If it is held that any provision of this License Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision will be deemed to be written, construed, and enforced as so limited.
14. **Entire Agreement.** The terms of this License Agreement constitute the entire agreement between the Parties, and no previous communications, representations or agreements either oral or written, between the Parties shall vary the terms of this License Agreement.

IN WITNESS WHEREOF, the Parties execute this License Agreement as of the date affixed to each signature.

**Licensor: Quasar Spendthrift Trust**

Signed: *Leo Riot*     Date: 07/12/2024

Name: Leo Riot
*Verified by signNow*
*07/12/2024 23:58:52 UTC*
*6dd3ad6bf6b84c72a6d0*

Title: Trustee

**Licensee: Apex Trader Funding Inc.**

Signed: *Darrell R. Martin*     Date: 07/12/2024

Name: Darrell R. Martin

Title: Chief Executive Officer